531 F.2d 648
 12 Fair Empl.Prac.Cas. 257,
11 Empl. Prac. Dec. P 10,740
Beraldine L. ACHA and Arlene M. Egan, each Individually and
on behalf of all others similarly situated, Appellants,
v.
Abraham D. BEAME, Individually and in his capacity as Mayor
of the City of New York, et al., Appellees.
 No. 397, Docket 75--7388.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 5, 1975.
Decided Feb. 19, 1976.
 
 Murray A. Gordon, New York City, for appellants.
 Leonard Koerner, New York City (W. Bernard Richland, Corp. Counsel, New York City, L. Kevin Sheridan, Gregory D. Frost, New York City, on the brief), for appellees.
 Lutz Alexander Prager, Atty., Equal Employment Opportunity Commission, Washington, D.C. (Abner W. Sibal, Gen. Counsel, Joseph T. Eddins, Jr., Associate Gen. Counsel, Beatrice Rosenberg and Charles L. Reischel, Attys., Washington, D.C., on the brief), as amicus curiae.
 Before KAUFMAN, Chief Judge, and SMITH and FEINBERG, Circuit Judges.
 FEINBERG, Circuit Judge:
 
 
 1
 This class action by two former female police officers of the New York City Police Department raises important questions as to the effect of a facially neutral seniority system on enforcement of the national policy against sex discrimination. Faced with notice of layoff because of New York City's well-publicized fiscal problems, plaintiffs brought suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and under 42 U.S.C. § 1983 and the fourteenth amendment against the City of New York, its Mayor and its Police Commissioner. The gist of the complaint was that since the threatened layoffs were based on seniority, they were sex-discriminatory because women had been prevented from obtaining the seniority necessary to avoid layoff by defendants' unlawful discrimination against them in the past. Judge Kevin T. Duffy of the United States District Court for the Southern District of New York denied plaintiffs' motion for a preliminary injunction and dismissed the complaint; the judge also refused permission to amend the complaint. In their appeal to this court, plaintiffs are supported by the Equal Employment Opportunity Commission as amicus curiae. For reasons set forth below, we reverse the order of the district court and remand for further proceedings.
 
 
 2
 * The facts are simple and, for purposes of this appeal, undisputed. Appellants Beraldine L. Acha and Arlene M. Egan represent a class of 371 female officers who were laid off on June 30, 1975. Before 1973, women were hired by the Police Department only for the job title Policewoman, for which there was an official quota amounting to 1.34 per cent of the total number of police officers. At the end of 1972, there were 355 Policewomen positions as compared to more than 26,000 Patrolmen. From 1964 to 1969, only two examinations for Policewoman were given, while many more examinations were offered for men applying to be Patrolmen. From 1969 to 1973, a hiring freeze applied to both Patrolman and Policewoman positions, but men could apparently be promoted to Patrolman from the position of Police Trainee, which was not open to women.
 
 
 3
 In January 1973, the titles of Patrolman and Policewoman were merged into the title of Police Officer. Men and women appointed thereafter received the same medical examination and the same training. However, appointments were made from separate lists in a ratio of four men to one woman, regardless of their comparable grades on examinations that had been identical, although given separately. Thus, some men were appointed prior to women who had received higher grades. By June 1975, the percentage of female police officers was 2.62 per cent.
 
 
 4
 On June 30, 1975, New York City laid off 4,000 police officers because of its fiscal crisis. These layoffs were made in accordance with section 80 of the New York Civil Service Law, reproduced in the margin,[1] which provides for the familiar last-hired, first-fired method of layoff. Since so many females had been hired only recently, this system affected them much more than the males. Judge Duffy found that 'The layoffs now proposed will reduce the number of females on the police force by 73.5 per cent, while only 23.9 per cent of the males will be discharged.'
 
 
 5
 Plaintiffs' complaint alleges that the facially neutral seniority system of section 80 actually perpetuated the past discriminatory hiring policies of the Police Department. For this reason, the layoffs violated plaintiffs' statutory rights under Title VII and their constitutional rights under the equal protection and due process clauses of the fourteenth amendment. In a brief memorandum opinion, Judge Duffy held, in effect, that defendants could not have acted illegally in following the mandate of section 80, which was a bona fide seniority system. In support of this conclusion, the judge cited two recent circuit court rulings,[2] which relied heavily on the exception in section 703(h) of Title VII, 42 U.S.C. § 2000e--2(h), for an employer applying 'different terms, conditions, or privileges of employment pursuant to a bona fide seniority . . . system.'[3] The judge also held that granting plaintiffs relief would constitute preferential treatment on the basis of sex, thus violating section 703(j) of Title VII, 42 U.S.C. § 2000e--1(j).[4]II
 
 
 6
 Appellants claim that the district court erred in various respects, both procedural and substantive. As to the former, appellants argue that the complaint should not have been dismissed on a motion for a preliminary injunction and that they should have been allowed to amend the complaint to clarify that they were the actual victims of prior discrimination. See Watkins v. United Steel Workers of America, Local 2369, 516 F.2d 41 (5th Cir. 1975). On the substantive issues, plaintiffs' principal claim is that the grossly disproportionate layoff of women under section 80 violated Title VII, despite section 703(h).
 
 
 7
 We turn to the procedural issues first. Judge Duffy dismissed the action on the merits although defendants had made no motion for such relief. Perhaps the judge regarded the hearing before him, at which no evidence was taken, as a consolidation of the hearing on plaintiffs' motion for a preliminary injunction with a trial on the merits, pursuant to Fed.R.Civ.P. 65(a)(2). If so, the failure to give plaintiffs notification of consolidation was improper, Johnson v. White, 528 F.2d 1228, 1231 (2d Cir. 1975), and the error was prejudicial, not harmless. See 7 Moore, Federal Practice P65.04(4). Defendants argue that the judge's action was justified because the complaint failed to state a cause of action and could not state one, even if amended, since layoffs under section 80, see note 1 supra, could not be unlawful. To the substantive issues raised by this argument we now turn.
 
 
 8
 After the job gains by minorities in the decade since enactment of Title VII, the recent downturn in the national economy has produced a disproportionately adverse effect on minority group employment. One significant cause has undoubtedly been the common use of the last-hired, first-fired seniority concept embodied in section 80. In the last few years, there have been many suits challenging use of such seniority systems on the ground that they violated Title VII or the Constitution. Courts have reached conflicting results,[5] and the issue is involved in a case presently pending before the Supreme Court. See Franks v. Bowman Transp. Co., 495 F.2d 398 (5th Cir. 1974), cert. granted, 420 U.S. 989, 95 S.Ct. 1421, 43 L.Ed.2d 669 (1975), argued Nov. 3, 1975, 44 U.S.L.W. 3273. We believe that the proper resolution of the controversy before us is indicated by two prior decisions in this circuit, the latter of which was too recent for Judge Duffy to take into account.
 
 
 9
 The critical issue in this litigation-- and in most of the cases listed in note 5 supra--is whether a facially neutral seniority system used to select the employees laid off is necessarily insulated from attack by section 703(h), quoted in note 3 supra. In United States v. Bethlehem Steel Corp., 446 F.2d 652 (2d Cir. 1971), we faced the same question in a somewhat different context. In that case, the United States charged that Bethlehem, with the acquiescence of various unions, had discriminated for decades in the hiring and job assignment of blacks at its steel plant in upstate New York. As a result, the comparatively few blacks who were hired were usually shunted off to 11 departments containing the lower-paid and more unpleasant jobs. The seniority system in effect was, for the most part, departmental rather than plant-wide. Transfers were discouraged because a transfering employee lost the seniority and other benefits he had enjoyed in his former department. Bethlehem argued to the district judge that the seniority and transfer provisions were typical of the steel industry, were necessary for safety and efficiency, and had not been instituted or continued for discriminatory reasons. Chief Judge Henderson rejected these contentions, and we affirmed, holding that:
 
 
 10
 The pervasiveness and longevity of the overt discriminatory hiring and job assignment practices, admitted by Bethlehem and the unions, compel the conclusion that the present seniority and transfer provisions were based on past discriminatory classifications. . . . Accordingly, Chief Judge Henderson's conclusions that the continued use of the seniority and tranfer provisions perpetuated discrimination and therefore violated the Act were surely correct.
 
 
 11
 446 F.2d at 659.
 
 
 12
 However, although the district judge ordered transfer priority for employees in the 11 segregated departments, he did not grant the Government all the relief it had sought. The judge refused to order that transferees from the 11 departments should lose no pay and should be able to use their plant-wide seniority for all purposes in their new department. On these issues, we reversed the district judge. We specifically rejected the argument that section 703(h) prevented 'any alteration of seniority rights.' 446 F.2d at 661--62. Among the reasons for our conclusion were that section 703(h) applies by its terms only to a 'bona fide' seniority system, which Bethlehem's was not, and that we agreed with Judge Butzner in Quarles v. Philip Morris, Inc., 279 F.Supp. 505, 516 (E.D.Va.1968), that 'Congress did not intend to freeze an entire generation of Negro employees into discriminatory patterns that existed before the act.'
 
 
 13
 Several aspects of the Bethlehem Steel decision are significant for this appeal. That the practices under attack were administered through a facially neutral seniority system did not protect the defendants from a finding that Title VII had been violated. Indeed, the operation of that system was altered because of its discriminatory effect. Further, as the EEOC points out in its amicus brief, Bethlehem's seniority list rankings resulted from pre-1965 discrimination that was lawful, however reprehensible it may have been.[6] Nevertheless, we ordered the seniority ranking to be changed, according to plant-wide rather than departmental seniority. Finally, we required Bethlehem and the unions to grant to individual blacks, who had been shown to have suffered discrimination since the date of their hire, greater seniority that they had under the existing rules at the plant.
 
 
 14
 Having noted all of this, we must immediately state that Bethlehem Steel does not directly control this case. The relief sought by appellants here is seniority credit not from the date of their appointment as police officers--they already have that--but from the date they would have been appointed had defendants not discriminated against women. This goes further than the relief ordered by our decision in Bethlehem Steel. Indeed, as appellees point out,[7] we took pains in Bethlehem Steel to refer to a memorandum of Senators Clark and Case, co-floor managers of the bill which ultimately became Title VII, upon which appellees here rely. We noted:
 
 
 15
 That memorandum, however, in focussing on formerly white-only plants, seems to say at most that the seniority of a white on a job will not be affected by the claims of blacks hired after he was. As we make clear below in discussing the precise relief to which we believe the Government is entitled, the discriminatorily assigned employees who transfer will not receive 'special seniority rights' or 'super-seniority.' Their seniority rights will be no greater than that accorded more fortunate employees. Both broups will bid against each other for vacancies on the basis of plant-wide seniority; an earlier-hired white employee will have greater seniority than a later-hired black.
 
 
 16
 446 F.2d at 661. Precisely what we did not do in Bethlehem Steel, appellees emphasize, is what plaintiffs desire here. That is, if plaintiffs are successful, an 'earlier-hired' male employee will not 'have greater seniority than a later-hired' female. Appellees are correct that in Bethlehem Steel we did not require that 'seniority' prior to the date of first hire be recognized. Significantly, in Bethlehem Steel, we did not face that issue because the Government, as we also took pains to point out, did not ask us to go that far in remedying the past discrimination. 446 F.2d at 659.
 
 
 17
 More recently, in Chance v. Board of Examiners (Chance IV), 534 F.2d 993, (2d Cir. 1976), we did reach that question. Plaintiffs in that case, which has had a long history in this court, sued under 42 U.S.C. §§ 1981, 1983, not under Title VII. Late in the litigation, the district court had to deal with problems arising out of the need of the New York City Board of Education to lay off some supervisory personnel, euphemistically referred to as 'excessing.' As the prior Chance decisions make clear,[8] many minority group supervisors had been appointed only recently because prior testing procedures had been discriminatory. In order to protect these gains, the district judge ordered the layoffs to be accomplished by means of a 'racial quota concept,' which had the 'inevitable consequence' that 'if racial quotas prevent the excessing of a Black or Puerto Rican, a white person with greater seniority must be excessed in his place.' At 997. The majority, Judge Oakes dissenting, focussed primarily on the racial quota and held it improper. Significantly for us, however, the court noted the following:
 
 
 18
 The relief fashioned by the court below was not designed to benefit only those affected by the employer's prior discriminatory conduct[6] or to insure that the excessing program operated in a non-discriminatory manner. It was intended to insure that there would continue to be a specified quota of Blacks and Puerto Ricans employed in the New York City school system.
 
 
 19
 To require a senior, experienced white member of such a group to stand aside and forego the seniority benefits guaranteed him by the New York Education Law and his union contract, solely because a younger, less experienced member is Black or Puerto Rican is constitutionally forbidden reverse discrimination. . . .
 
 
 20
 If a minority worker has been kept from his rightful place on the seniority list by his inability to pass a discriminatory examination, he may, in some instances, be entitled to preferential treatment--not because he is Black, but because, and only to the extent that, he has been discriminated against. The 'freedom now' and 'rightful place' doctrines create constructive or fictional seniority to put minority employees in the approximate spot on the seniority list that they would have occupied had they not been the subject of discrimination. Local 189, United Papermakers v. United States, supra, 416 F.2d at 988. The former contemplates the displacement of white workers where necessary; the latter involves only the filling of vacancies. We have followed the 'rightful place' doctrine to the extent of using plant seniority, instead of departmental seniority, where departmental discrimination has prvented or delayed the transfer of minority workers. United States v. Bethlehem Steel Corp., 446 F.2d 652 (2d Cir. 1971).
 
 
 21
 There is disagreement among the Circuits as to how far these concepts should be carried in creating fictional dates of employment for minority workers. Cf. Franks v. Bowman Transportation Co., 495 F.2d 398 (5th Cir. 1974), cert. granted, 420 U.S. 989, 95 S.Ct. 1421, 43 L.Ed.2d 669 (1975), argued November 3, 1975, 44 U.S.L.W. 3273; Meadows v. Ford Motor Company, 510 F.2d 939 (6th Cir. 1975). Upon remand of this case, the District Court may find it unnecessary to await resolution of this dispute by the Supreme Court. The defendant Board of Education has indicated its willingness to accord constructive seniority to any minority supervisor who failed an examination since invalidated as discriminatory by giving him a date of appointment which is the mean appointment date of those who passed the examination. We believe this offer of compromise which appears to be acceptable to the intervening Union should have been adopted by the District Court. (Emphasis added; some footnotes omitted.)
 
 
 22
 At 998--999.
 
 
 23
 We regard this language--particularly the emphasized portion--as instructive on the issues before us. What the court in Chance IV would not approve was '(t) o require a senior, experienced white (supervisor) to stand aside and forego the seniority benefits guaranteed him . . . solely because a younger, less experienced member is Black or Puerto Rican.' The meaning of 'solely' in this sentence is clarified by the reference to the concededly 'small percentage of the minority supervisors appointed since the inception of this litigation' who had failed the discriminatory examinations. Relief for this small group would not be 'solely' because they were black; nor would it be a 'non-remedial distortion of a seniority system through preferential treatment based solely upon race . . ..' At---. Chance IV indicates that retroactive 'constructive' seniority, even prior to the date of appointment, might be appropriate relief for any identifiable minority group supervisor who had taken a discriminatory examination and failed. It is for this reason that the majority stated that a compromise embodying precisely that concept 'should have been adopted by the district court.'[9]
 
 
 24
 Such constructive seniority back to the date when they would have been hired had there been no discrimination is the relief sought by the laid-off women here, at least in their amended complaint. We believe that Bethlehem Steel and Chance IV both indicate that plaintiffs are entitled to that relief if they can prove their case under conditions discussed below. Moreover, we do not rely merely upon the radiations of these two decisions. Even if the slate were clean, we would reach the same results for reasons which, in view of our prior precedents, we set forth more briefly than we might otherwise.
 
 
 25
 If a female police officer can show that, except for her sex, she would have been hired early enough to accumulate sufficient seniority to withstand the current layoffs, then her layoff violates section 703(a)(1) of Title VII, 42 U.S.C. § 2000e--2(a)(1), since it is based on sexual discrimination. Defendants argue that recognizing such constructive seniority violates section 703(h) and point particularly to the Clerk-Case Memorandum cited in Bethlehem Steel, supra. We do not agree. The legislative history of that section is sufficiently cloudy to warrant looking at Title VII's purposes and policies in interpreting section 703(h), rather than just at the Clark-Case Memorandum. See Note, Last Hired, Fist Fired Seniority, 11 Colum.J. of L. and Social Problems 343, 369--71 (1975); Cooper and Sobol, supra note 5, at 1607--14. With those general purposes in mind--particularly the congressional intention in amending Title VII in 1972 'to give the courts wide discretion exercising their equitable powers to fashion the most complete relief possible' and to restore aggrieved persons 'to a position where they would have been if not for the unlawful discrimination'[10]--we believe that the relief plaintiffs seek would prevent the perpetuation of the effects of past discrimination as to them. See Albemarle Paper Co. v. Moody, 422 U.S. 405, 413--25, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). See also Watkins, 516 F.2d at 45.
 
 
 26
 Our own decision in Bethlehem Steel, supra, and the many in other circuits holding discriminatory facially neutral departmental or job seniority[11] lend further support for our view. In determining the effect of section 703(h) as an exception to liability under the Act, we see no sufficient basis for distinguishing between facially neutral departmental and plant-wide seniority systems. Under certain circumstances, either can for the purposes of Title VII lose the protection of being 'bona fide' under section 703(h). Indeed, the very circuit court of appeals that apparently originated the distinction in dictum[12] has recently been careful to note that it may not apply to plaintiffs like these.[13] Moreover, in this case, unlike such departmental seniority cases as Bethlehem Steel, we are not invalidating or altering portions of the seniority system at all. We are merely putting plaintiffs in their rightful place in it. Until the past discrimination against these particular plaintiffs is remedied by according them the seniority position to which they are entitled, the system cannot be considered 'bona fide' and in fact represents a continuation of past intentionally discriminatory practices, and thus falls outside the terms of section 703(h). Also, there is an element of 'fictional,' or constructive, seniority in the relief granted in the departmental seniority cases. Plant-wide seniority was used in Bethlehem Steel not because it was earned but because it was 'a convenient approximation of what the black employees' departmental seniority would have been absent discrimination in the past.' Harvard Note, supra note 5, at 1556. It may be that the distinction between seniority from date of hire and earlier, constructive seniority seems attractive because of the unstated moral premise that it is wrong to give seniority credit to one who did not work for it. Harvard Note, at 1555. But the limited number of employees who might get such seniority here were prevented by defendants' wrongdoing from attaining it before. Moreover, as Chief Judge Kaufman notes in his concurring opinion, plaintiffs here have in this respect a more compelling claim to relief than plaintiffs in Bethlehem Steel. Plaintiffs here were not merely relegated to inferior jobs, but were denied employment altogether for discriminatory reasons. Finally, in analogous situations arising under the National Labor Relations Act, employers are required 'to credit all (discriminated-against) employees with such seniority and other rights and privileges that would have accrued to them as of the dates they would have been hired, absent the discrimination against them.' Atlantic Maintenance Co., 134 NLRB 1328, 1336 (1961), enf'd, 305 F.2d 604 (3d Cir. 1962). See also Consolidated Dairy Products, 194 NLRB 701 (1971). Cf. also Tilton v. Missouri Pac. R.R., 376 U.S. 169, 84 S.Ct. 595, 11 L.Ed.2d 590 (1964) (awarding back seniority to veterans under the former 50 U.S.C. App. § 469(b), now 38 U.S.C. § 2021(a)).
 
 
 27
 In short, we believe that the district court erred in apparently concluding that because of section 703(h) layoffs under the facially neutral formula of section 80 of the New York Civil Service Law could not violate Title VII. We disagree as well with the holding that retroactive seniority would necessarily violate section 703(j). See note 4 supra. Award of seniority to those who had actually been discriminated against by these defendants is not a 'preference' because of sex. It is rather a remedial device well within the broad power conferred on the district court by section 706(g). 42 U.S.C. § 2000e--5(g).[14]
 
 III
 
 28
 The case must, therefore, be remanded to the district court for further proceedings consistent with this opinion.[15] The record at this point is sparse and it is not clear which facts are admitted and which are contested. The layoffs have already taken place and plaintiffs have indicated that they are flexible as to the relief they now seek, including 'placement of appellants at the top of the recall list.'[16] The district court should expeditiously determine--either by stipulation or after a hearing--which plaintiffs now laid off would have been hired early enough to obtain sufficient seniority to avoid layoff had it not been for defendants' discriminatory hiring practices. This limited group will be composed only of those plaintiffs who themselves were the victims of discrimination by the defendants.
 
 
 29
 For guidance of the district court, we suggest that the burden of satisfying the court on this issue by a preponderance of the evidence should be on the individual plaintiffs. The female police officer might, for example, satisfy her burden by demonstrating that she actually filed an application for employment or wrote a letter complaining about the hiring policy early enough during the period of discrimination, or offer proof that she had expressed a desire to enlist in the police force but was deterred by the discriminatory practice barring females. Relief will, of course, be limited to persons who eventually were accepted as police officers, so there is no question about their qualifications for the job. We emphasize that we are not deciding the appropriate relief to which those plaintiffs who can satisfy the above conditions are entitled. That is a matter, in the first instance, for the district court with due regard to the necessity of minimizing disruption in the operation of the Police Department. We decide only that the layoffs here under section 80 of the Civil Service Law were not insulated from attack by sections 703(h) or 703(j) of Title VII, and that those plaintiffs who can show that their lack of seniority is the result of past discrimination by defendants are entitled to relief.
 
 
 30
 Reversed and remanded for further proceedings consistent with this opinion.
 
 IRVING R. KAUFMAN, Chief Judge (concurring):
 
 31
 I fully concur in Judge Feinberg's wellreasoned opinion, and would merely offer a few additional observations in order to avoid any misconstruction of our holding.
 
 
 32
 One principle is clear to me. We do not, by our holding today, seek to disparage the wide range of benefits that may flow from a properly functioning seniority system. A 'last-hired, first-fired' plan appropriately provides longer-employed individuals with a substantial measure of freedom from fear of unemployment. It, therefore, enables them to engage in meaningful long-range personal planning while simultaneously inducing a degree of peace of mind that may enhance their productivity on the job. And, by rewarding the worker who avoids frequent job changes, it may have an impact on the economy itself, by reducing duplicative hiring and training costs, and, of course, it properly benefits the individual employer. The apparent neutrality and fairness of the procedure tends to promote labor peace and, indeed, prohibits the employer from discriminatorily discharging certain individuals because of race or sex.
 
 
 33
 Accordingly, it is important to emphasize that our holding is in no way intended to alter or compromise the underlying structure of the seniority system established by § 80 of the New York Civil Service Law. It merely represents a refusal to allow a system intended as a safeguard against arbitrariness to become a device for perpetuating past caprice. Nor does our decision sanction the use of preferential treatment or reverse discrimination to achieve this end. The standard we have established restricts relief to those who have already demonstrated their qualifications for the position of police officer and can prove that they were improperly deprived of their rightful place in the seniority hierarchy. The maximum remedy authorized by our decision for those plaintiffs who satisfy their burden of proof, under the circumstances present here, is nothing more than to be restored to parity with the male police officers hired at the time these female police officers were discriminatorily denied employment. The only special advantages implicated by our holding are those improperly received by some male police officers, whose location high on the seniority list resulted from unfair discrimination at the expense of equally or more qualified females. Such unjust preferential treatment should be corrected and eradicated.
 
 
 34
 Of course, to require mathematical certainty of proof would be to render the rights we confer impossible to vindicate in practice. Perhaps two examples will illuminate the results we anticipate. The June 30, 1975 layoffs applied, it appears, only to officers hired after March, 1969. If so, relief should be available to an individual who proves she took the 1964 examination for 'policewoman,' achieved a score on that examination that, were she a man, would have assured her employment, but nevertheless was not appointed until 1970 solely because of the low quota for women prevailing in the Police Department in 1964. This person satisfies the burden of proving that she would have had sufficient seniority to withstand the § 80 layoff but for the discrimination in 1964. Such a showing would not, however, be possible for a female who became a police officer upon reaching the minimum hiring age for police officers in 1973 (assuming, as we do, that all officers hired after 1969 must be laid off under the § 80 formula).
 
 
 35
 It is conceivable that the standard of proof we require may be difficult or impossible to meet for some female police officers who took no overt action with regard to employment in the Police Department during the years in which discrimination in hiring prevailed. Nor would it be appropriate to interpret our holding as stating that some female officers will be put into a favored position to claim that relief must be automatic even though they cannot establish that the prior discrimination in any way deterred them from, or interfered with their quest for, employment in the Police Department. The proof required should not pose a problem in the future, however, in view of the notice our opinion provides to all. Moreover, because of the male police officers' important countervailing interest, we believe it inappropriate to establish a special or double standard for the plaintiffs before us, even though they obviously had no notice, at the time they suffered discrimination, of the requirements we now impose.
 
 
 36
 We entertain no doubts that those who do meet the standard of proof here established have a right to be positioned within the seniority system as if they had been hired at a time earlier than they actually were. As Judge Feinberg emphasized, this Court and others have provided remedies under Title VII for minority employees who were hired but discriminatorily relegated to less desirable departments within a company--and then disadvantaged by facially neutral departmental seniority systems. Surely, it would be incongruous to deny relief to those who were not simply restricted to less attractive jobs, but indeed were discriminatorily refused any employment at all.
 
 
 
 [1]
 Section 80 provides:
 
 
 [1]
 Suspension or demotion. Where, because of economy, consolidation or abolition of functions, curtailment of activities or otherwise, positions in the competitive class are abolished or reduced in rank or salary grade, suspension or demotion, as the case may be, among incumbents holding the same or similar positions shall be made in the inverse order of original appointment on a permanent basis in the classified service in the service of the governmental jurisdiction in which such abolition or reduction of positions occurs, subject to the provisions of subdivision seven of section eighty-five of this chapter (granting special preferences to the blind and veterans)
 
 
 [2]
 Jersey Central Power and Light Co. v. Local Union 327, 508 F.2d 687 (3d Cir. 1975), pets. for cert. filed, 44 U.S.L.W. 3084 (U.S Aug. 1, 1975), 44 U.S.L.W. 3207 (U.S. Sept. 24, 1975), and Waters v. Wisconsin Steel Works, 502 F.2d 1309 (7th Cir. 1974), pet. for cert. filed, 44 U.S.L.W. 3011 (U.S. Apr. 25, 1975)
 
 
 [3]
 This section provides:
 Notwithstanding any other provisions of (Title VII), it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system . . ., provided that such differences are not the result of an intention to discriminate because of . . . sex
 
 
 [4]
 This section provides:
 Nothing contained in (Title VII) shall be interpreted to require any employer . . . to grant preferential treatment to any individual or to any group because of the . . . sex . . . of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any . . . sex . . . employed by any employer . . . in comparison with the total number of percentage of persons of such . . . sex . . . in any community . . ..
 
 
 [5]
 See, e.g., Watkins v. United Steel Workers of America, Local 2369, 516 F.2d 41 (5th Cir. 1975); Meadows v. Ford Motor Co., 510 F.2d 939 (6th Cir. 1975), pet. for cert. filed, 43 U.S.L.W. 3594 (U.S. May 6, 1975); Jersey Central Power and Light Co. v. Local Union 327, supra note 2; Waters v. Wisconsin Steel Works, supra note 2; Schaefer v. Tannian, 394 F.Supp. 1136 (E.D.Mich.1975). See also Cooper and Sobol, Seniority and Testing Under Fair Employment Laws: A General Approach to Objective Criteria of Hiring and Promotion, 82 Harv.L.Rev. 1598 (1969); Note, Last Hired, First Fired Layoffs and Title VII, 88 Harv.L.Rev. 1544 (1975) ('Harvard Note')
 
 
 [6]
 EEOC brief, 29 n. 16
 
 
 [7]
 Appellees' brief, 19--20
 
 
 [8]
 See Chance v. Board of Examiners, 458 F.2d 1167 (2d Cir. 1972); Chance v. Board of Examiners, 496 F.2d 820 (2d Cir. 1974); Chance v. Board of Examiners, 497 F.2d 919 (2d Cir. 1974)
 
 
 [6]
 Plaintiffs concede that only a small percentage of the minority supervisors appointed since the inception of this litigation failed the examinations found to be discriminatory, and there is no showing as to how many were even eligible to take such examinations
 
 
 [9]
 On this issue, the dissent agreed with the majority. At 1005. The thrust of the dissenting opinion was that not enough relief was being granted to remedy the past discrimination
 
 
 [10]
 Equal Employment Opportunity Act of 1972--Conference Report, 118 Cong.Rec. 7166, at 7168 (1972)
 
 
 [11]
 See, e.g., Pettway v. American Cast Iron Pipe Co., 494 F.2d 211 (5th Cir. 1974); Bing v. Roadway express, 485 F.2d 441 (5th Cir. 1973); United States v. N.L. Industries, 479 F.2d 354 (8th Cir. 1973); United States v. Chesapeake & O. Ry., 471 F.2d 582 (4th Cir. 1972), cert. denied sub nom., Locals 268 and 1130 of Bhd. of R.R. Trainmen v. United States, 411 U.S. 939, 93 S.Ct. 1893, 36 L.Ed.2d 401 (1973); United States v. Hayes Int'l Corp., 456 F.2d 112 (5th Cir. 1972); United States v. Jacksonville Terminal Co., 451 F.2d 418 (5th Cir. 1971); Robinson v. Lorillard Corp., 444 F.2d 791 (4th Cir.), cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971); Local 189, United Papermakers & Paperworkers v. United States, 416 F.2d 980 (5th Cir. 1969), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 108 (1970); Quarles v. Philip Morris, Inc., 279 F.Supp. 505 (E.D.Va.1968)
 
 
 [12]
 Local 189, United Papermakers & Paperworkers v. United States, supra note 11, 416 F.2d at 995
 
 
 [13]
 Watkins v. United Steel Workers of America, Local No. 2369, supra note 5, 516 F.2d at 47--48
 
 
 [14]
 This section provides:
 If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . ., or any other equitable relief as the court deems appropriate. . . .
 
 
 [15]
 On this disposition, it is unnecessary to deal with plaintiffs' claims under 42 U.S.C. § 1983 or their argument that the illegality of defendants' hiring policies prior to Title VII is a controlling consideration in applying § 703(h)
 
 
 [16]
 Plaintiffs' brief. 37--38