EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff-Appellee,

v.

LOCAL 14, INTERNATIONAL UNION OF OPERATING ENGINEERS, and Local 15, International Union of Operating Engineers, et al., Defendants-Appellants.

Nos. 637, 698–701, Dockets 76–6150, 76–6157 and 76–6164 to 76–6166.

United States Court of Appeals, Second Circuit.

Argued Dec. 15, 1976.

Decided March 21, 1977.

Robert A. Kennedy, Garden City, N. Y. (Doran, Colleran, O'Hara, Pollio & Dunne, P. C., Richard L. O'Hara, Garden City, N. Y., of counsel), for defendant-appellant Local 14, International Union of Operating Engineers.

William D. Appler, Washington, D. C. (Edward C. O'Connell, Bonner, Thompson, Kaplan & O'Connell, Frank Petramalo, Jr., Bredhoff, Cushman, Gottesman & Cohen, Washington, D. C., Robert D. Brady, Corcoran & Brady, New York City, of counsel), for defendant-appellant Local 15, International Union of Operating Engineers.

Harold R. Bassen, New York City, for defendant-appellant Allied Building Metal Industries, Inc.

James J. A. Gallagher, New York City (Shea, Gould, Climenko & Casey, New York City, James E. Frankel, Albany, N. Y., of counsel), for defendant-appellant General Contractors Association of New York, Inc.

Mary-Helen Mautner, Washington, D. C. (Abner W. Sibal, Gen. Counsel, EEOC, Joseph T. Eddins, Associate Gen. Counsel, EEOC, Beatrice Rosenberg, Asst. Gen. Counsel, EEOC, Washington, D. C., of counsel), for plaintiff-appellee, Equal Employment Opportunity Commission.

Before TIMBERS, GURFEIN and VAN GRAAFEILAND, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

This action, brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* (Act),[1] charges Locals 14 and 15 of the International Union of Operating Engineers with discriminating against non-whites and Spanish surnamed workers. Ten contractors associations which negotiate collective bargaining agreements with the two locals were joined as defendants under Fed.R.Civ.P. 19(a) for purposes of relief only.

The trial was limited to the issue of liability, and only the union defendants participated. On May 6, 1976, Judge Tenney issued an opinion in which he concluded that both locals had violated the Civil Rights Act, basically because of their admission and referral practices. Although all parties were directed to submit proposed orders, after hearing argument thereon, the Judge issued an order substantially as proposed by the plaintiff. The two locals and two contractors associations, the General Contractors Association of New York, Inc. (GCA) and the Allied Building Metal Industries (ABMI), have appealed. The associations' appeal is directed only to the grant of relief.[2]

Locals 14 and 15 are chartered locals of the International Union of Operating Engineers, whose members operate machinery in building and heavy construction work. Although their trade jurisdictions are similar and some of the equipment utilized by Local 15 is comparable to equipment used by Local 14, generally the latter's is larger, or is operated in different areas on the construction site.[3] Judge Tenney found that the geographic jurisdiction of both locals was New York City, they being the only operating engineer locals in the country which are chartered for the same geo-

---

1. The United States was the original plaintiff. Prior to trial, however, the Equal Employment Opportunity Commission was substituted in accordance with the 1972 amendments to Title VII, 42 U.S.C. § 2000e–6(d).

2. On appeal, two individual union members, Joseph Erskine and Lawrence Morrison, have been permitted to file *amicus* briefs in which they urge reversal.

3. For example, although both locals operate cherry pickers and front-end loaders, Local 14 operates this equipment on structures above ground level while Local 15 does so at ground level only.

graphic jurisdiction. In other sections of the country, Local 15 members would be considered Junior and Assistant Engineers within a subdivision of Local 14.

Historically, the membership of both locals has been largely white. Judge Tenney found that Local 14's membership in 1974 was only 2.8% minority (44 out of 1555 members). Local 15's percentage was slightly higher, 6.5% (415 out of 6,362 members). He also found that the available labor pool for operating engineers in New York City consisted primarily of males living in the City who have a high school education or less; that the black percentage of this pool was 20.76% and the percentage for Spanish surnamed males was 15.63%. The total minority percentage for the group was therefore 36.39%. Following the "effect to cause" procedure described in *Kirkland v. New York State Department of Correctional Services,* 520 F.2d 420, 425 (2d Cir. 1975), *cert. denied,* 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976), Judge Tenney found that this disparity in percentages between the membership and the available labor pool established a prima facie case against both unions.

### Local 15

In determining the proper geographic reference area, the District Judge indicated that he would use the area encompassed by "the Union's jurisdiction, and from which the industry draws employees." However, Local 15 contends that, insofar as it is concerned, he could not consistently do both because a significant percentage of its members reside outside the City. The EEOC says this makes no difference, because the appropriate geographic area should be that in which the union members work, not where they live. We disagree. Where a union draws its membership almost entirely from within its geographic jurisdiction, it may be convenient to accept

this area as the source of its labor pool. In cases where this situation has existed, the question presented here has generally not even been raised. *Cf. Rios v. Steamfitters Local 638,* 501 F.2d 622 (2d Cir. 1974) (union's jurisdiction included five boroughs of New York City, plus Nassau and Suffolk Counties). However, where a significant number of union members come from outside the union's geographic jurisdiction, the court must widen its sights; the appropriate reference area then should be that region from which the union draws its members.[4] *See United States v. Hazelwood School District,* 534 F.2d 805 (8th Cir. 1976), *cert. granted,* 429 U.S. 1037, 97 S.Ct. 730, 50 L.Ed.2d 747 (1977); *cf. EEOC v. Steamfitters Local 638,* 542 F.2d 579, 591 (2d Cir. 1976), *cert. denied,* —— U.S. ——, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977); *United States v. Elevator Constructors Local 5,* 538 F.2d 1012, 1016 (3d Cir. 1976).

Local 15 calculates that, if the proper reference area is used, the minority percentage in the labor pool would be 16.2%. Assuming that this figure is correct, there is still sufficient disparity between it and the local's 1974 minority membership percentage of 6.5% to create an inference of discrimination. *See Boston Chapter, NAACP, Inc. v. Beecher,* 504 F.2d 1017, 1020 n.4 (1st Cir. 1974), *cert. denied,* 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975). However, in Local 15's attack on the District Court's finding of a prima facie case, the second half of its one-two punch is aimed at that court's use of the 6.5% figure.

Local 15 argues that this figure is misleading. The union points out that, of its approximately 6300 members, 5000 had been admitted prior to July 2, 1965, the effective date of the Act. Since that date, approximately 20% of its new members have been minority workers. Moreover, this increase in minority membership does

4. The arbitrariness in simply using the union's geographic jurisdiction, without considering the area from which the union's members are drawn, is obvious. Indeed, this standard would give a union, so inclined, the opportunity to engage in jurisdictional gerrymandering and

the ability to frustrate the purposes of the Act. By assigning certain residential areas to a local's jurisdiction and excluding others, the unions could control, in a totally arbitrary fashion, the minority percentage in any jurisdiction.

not appear to have been inspired by the instant suit. With only two exceptions, the admission rate for each year between 1965 and the date that this action was filed, exceeds 16.2%. As a result, the number of Local 15's minority members has steadily increased since the effective date of the Act.

It is established law that "practices, procedures or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices", *Griggs v. Duke Power Co.*, 401 U.S. 424, 430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971), and that practices which "perpetuate" past discrimination violate the Act. *See Acha v. Beame*, 531 F.2d 648 (2d Cir. 1976); *United States v. Bethlehem Steel Corp.*, 446 F.2d 652 (2d Cir. 1971). However, if the figures advanced by Local 15 are correct, the union's present practices neither perpetuate nor freeze the effects of past discrimination. Looking to the post-Act statistics, *see United States v. Jacksonville Terminal Co.*, 451 F.2d 418, 444 (5th Cir. 1971), *cert. denied*, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972), Local 15's consistent practice since 1965 has been to admit a higher percentage of minority workers than the percentage of minority workers in the labor force. Keeping in mind that it remains a primary goal of Title VII "to induce voluntary compliance by employers and unions", *Patterson v. American Tobacco Co.*, 535 F.2d 257, 268 (4th Cir.), *cert. denied*, 429 U.S. 920, 97 S.Ct. 314, 50 L.Ed.2d 286 (1976), we conclude that the union's figures show a substantial compliance with the Act, aimed at eliminating rather than perpetuating the results of pre-Act discrimination. *See Taylor v. Safeway Stores, Inc.*, 524 F.2d 263, 271–72 (10th Cir. 1975); *cf. Parham v. Southwestern Bell Telephone Co.*, 433 F.2d 421 (8th Cir. 1970);

*Patterson v. American Tobacco Co., supra,* 535 F.2d at 274–75.[5]

Subsequent to the oral argument of this appeal, the EEOC sent a letter to the court in which it questioned the existence of any support in the record for Local 15's annual minority admission figures. This belated attack on Local 15's statistical argument runs counter to the position taken in the EEOC's brief where it admitted that "the figures do show an increased percentage of minority admissions after the enactment of Title VII. . . ." The EEOC's argument in its brief was basically that the union's allegations of increased minority admissions, although true, were irrelevant. We find that they are not irrelevant. In addition to its minority admissions, Local 15 has also had minority officers and has participated in certain affirmative action programs. It does not further the purposes of Title VII to find liability in a union which has seemingly complied with the Act's provisions since its enactment in 1965. We must carefully balance the need for effective enforcement of the Act against over-zealous enforcement which can only lead to resentment and a resistance to change. *Cf. Vulcan Society of the New York City Fire Department, Inc. v. Civil Service Commission*, 490 F.2d 387, 399 (2d Cir. 1973).

We therefore reverse Judge Tenney's finding of liability as to Local 15 and remand to the District Court for a reconsideration of that issue in accordance with the views expressed above. Both the EEOC and Local 15 may submit whatever additional evidence they think will be helpful to the District Court on the rehearing. Because we are reversing and remanding for further statistical findings, we do not pass upon Judge Tenney's conclusions regarding the union's recruitment practices, admission tests and referral policies. It is clear from the Judge's opinion that he relied on his

5. Both the *Parham* and *Patterson* courts found that the defendants had made substantial efforts to eradicate the effects of past discrimination and therefore neither an injunction nor the imposition of a quota was necessary. While these *new programs* did not prevent a finding of liability, in those cases the salutory practices relied upon by the companies occurred "long after the passage of Title VII". *Patterson v. American Tobacco Co., supra,* 535 F.2d at 275. Here, Local 15's admission figures have conformed to the percentage of minorities in the applicable labor force since the effective date of the Act.

prior finding of a prima facie case in deciding these issues and placed the burden of justification upon the local. If, on remand, the EEOC is unable to establish a prima facie case through statistical evidence, it will bear the burden of proving discrimination in each of these separate areas.

### Local 14

■■ The statistical evidence in the record shows that Local 14 has not been admitting a significant percentage of minority individuals since the effective date of the Act. Thus, while the court below may have used the wrong geographic reference area in finding that the EEOC had established a prima facie case, as to Local 14 any error was harmless. Even if the figure of 16.2% which Local 15 claims to be the minority percentage in the labor force of the proper reference area is used, Local 14's total minority membership of 2.8% is nonetheless sufficiently disparate therefrom to support the EEOC's prima facie case against it. *See Boston Chapter, NAACP, Inc. v. Beecher, supra,* 504 F.2d at 1020 n.4. Conceding this, in effect, Local 14 contends that the disparity resulted from membership prerequisites which were job related and therefore justified. However, we find that there was adequate evidence from which Judge Tenney could conclude that Local 14's admission requirements—a New York City Hoist Operator's license, the ability to operate more than one piece of equipment, and 200 days' experience—were not justifiable job related membership prerequisites.

Much of the equipment operated by Local 14 members does not require a licensed operator, and the testimony showed that some present members of Local 14 specialize in operating equipment of this type. Thus, it is possible for an individual to earn a living as an operating engineer without a city license; and, for this reason, some members of the union have allowed their licenses to lapse. Since very few minority members of the labor pool have licenses, this requirement operates unfairly to exclude minorities from Local 14 membership. The result is the same regarding the local's

requirement that a member should be able to operate more than one piece of equipment. As noted above, Local 14 members tend to specialize, and the local has shown no compelling reason why an individual, qualified to operate one piece of equipment, should not be admitted to the union so as to be able to seek employment as an operator of that machine. Local 14's admission requirement of 200 days' experience is more difficult to fault. The union was justified in establishing some prerequisites for membership, and experience truly is the best teacher. However, we are not prepared to say that the District Judge erred in holding that qualifications for union membership could not be measured in a less prejudicial manner. In short, we find that the proof was sufficient to support the District Court's finding of liability on the part of Local 14.

### The Grant of Relief

■ When a District Court finds that discriminatory practices on the part of a union or an employer have prejudiced minority workers, it should frame its relief with an eye toward remedying the wrong, *see generally Albemarle Paper Co. v. Moody,* 422 U.S. 405, 421, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), and should interfere with the defendant's operations no more than is necessary to accomplish this result. *Cf. Chance v. Board of Examiners,* 534 F.2d 993, 998–99 (2d Cir.), *petition for cert. filed,* 45 U.S.L.W. 3178 (Sept. 7, 1976); *EEOC v. Local 638 . . . Local 28, Sheet Metal Workers,* 532 F.2d 821, 829 (2d Cir. 1976); *Kirkland v. New York State Department of Correctional Services, supra,* 520 F.2d at 430; *Rios v. Steamfitters Local 638, supra,* 501 F.2d at 633. This means that it should not proceed to issue a broad sweeping remedial order without some evidence before it as to the effect which the order will have. *Cf. Ostapowicz v. Johnson Bronze Co.,* 541 F.2d 394, 401–02 (3d Cir. 1976), *cert. denied,* 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977).

The order appealed from is nothing, if not sweeping. Adopting almost in toto the

proposed order of the EEOC, it contains 61 decretal paragraphs. These provide, among other things, for (1) minimum racial goals for non-white membership commencing with 14% for Local 15 and 10% for Local 14 by September 1, 1977 and increasing to 36% for each by September 1, 1981; (2) awards of back pay and pension and welfare benefits; (3) complete restructuring of membership qualifications; (4) reduced membership fees for non-whites and pro-rating the payment thereof; (5) conditional memberships for non-whites; (6) the operation of a single hiring hall by both unions, with one master eligibility list and a joint hiring hall sheet, with a proscription against any member receiving a job referral except from these lists; (7) a ban against any union member seeking or receiving work directly from any employer; (8) referral of members to employers only in accordance with the eligibility list; (9) equal distribution of overtime work by employers; (10) re-registration and re-referral of any member laid off by a contractor for more than three days; (11) seniority lay-off rights for employed members; (12) adoption of an apprentice training program; (13) appointment of an administrator at a salary of $70 per hour; and (14) payment by the unions and/or the contractors of compensation to any non-white workman suffering loss of work because of a violation of the order.

The staggering effect of this order upon, not only the unions, but also the contractors for whom their members work is obvious. Despite this fact, the order issued following a bifurcated trial directed only to the issue of liability. We conclude that this was error.

■ In some cases it may be unnecessary to provide a full evidentiary hearing on relief to a party that has fully participated in prior stages of the proceeding. See *United States v. Wood, Wire and Metal Lathers Local 46*, 471 F.2d 408, 415–16 (2d Cir.), *cert. denied*, 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973). Here, however, the trial was on the issue of liability only, and the contractors associations were named as defendants simply for purposes of

relief. They did not participate in the trial on liability; and consequently, when Judge Tenney decided not to hold a hearing on relief, they were completely foreclosed from introducing any proof as to the untoward effects of his order upon them. We need not pass upon the associations' contentions that this procedure violated their due process rights, because we find that it violated a specific agreement among the parties. Included in the pretrial order issued by the District Court was a stipulation between GCA and the EEOC that the former would have "a full opportunity to offer proof" on the issue of relief.

In any event, the record is incomplete with regard to industry practices and conditions. *See, e. g., EEOC v. Local 638. . . Local 28, Sheet Metal Workers*, 401 F.Supp. 467, 489 n.30 (S.D.N.Y.1975), *aff'd as modified*, 532 F.2d 821 (2d Cir. 1976). We are unable to judge the effect which the District Court's directives will have on the construction business and are thus incapable of determining whether Judge Tenney's broad order is so unreasonable as to constitute an abuse of discretion. We therefore remand to the District Judge so that he may conduct a full evidentiary hearing concerning the practices and procedures in the construction industry and the effect which his order will have, not only upon the defendant unions, but also upon the defendant contractors associations and their members. He should find particularly what effect a provision exclusively limiting the employers' right to hire to those sent from the hiring hall would have on the industry by comparison with present practices.

Upon the argument of the appeal, the unions' representatives forcibly urged that the appointment of an administrator whose salary, on the basis of a 40 hour week, could amount to $140,000 a year, was unwarranted because there was no reason to believe that the unions would not comply with a proper order of the court. We agree that "union self-government is desirable" and "an ideal to which the law aspires", *EEOC v. Local 638 . . . Local 28, Sheet Metal Workers, supra*, 532 F.2d at 829. How-

258

ever, we leave this matter for further exploration with the District Court and the proper exercise of its discretion.

Remanded to the District Court for further proceedings in accordance with this opinion.